## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **PETRO DERAN PUGH,** | ) | |
| **AIS 192319,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:21-cv-260-RAH-CWB** |
| | ) | |
| **BRANDON FLOYD, CO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>RECOMMENDATION OF THE MAGISTRATE JUDGE</u>

### I.   Introduction

Petro Pugh, an inmate incarcerated at Ventress Correctional Facility in Clayton, Alabama, filed this action to assert claims under 42 U.S.C. § 1983.  (Doc. 1).[1]  Named as defendants are Lieutenant Victor Nieves and Correctional Officers Paris Thomas and Brandon Floyd—all of whom are named in both their official and individual capacities.  (*Id*.).  Pugh's core allegation is that the defendants acted in violation of the Eighth Amendment by failing to protect him from an inmate assault.  (*Id*. at pp. 2-4).  Pugh has requested a jury trial and an award of damages. (*Id*. at pp. 1, 6, & 7).

The defendants responded first by filing a Special Report and Answer (Doc. 21), which included various evidentiary materials (*see* Docs. 21-1 through 21-5).  The defendants later filed supplemental reports and materials as specifically directed by the court. (Docs. 27 through 27-2 & Docs. 42 through 42-3).  Pugh in turn submitted written responses to the defendants' arguments (Docs. 36 & 48), along with affidavits from numerous inmate witnesses (*see* Doc. 36-1).

---

[1]   References to documents filed in this proceeding are designated as "Doc."  Pinpoint citations refer to page numbers affixed electronically by the CM/ECF filing system and may not correspond to pagination on the original versions presented for filing.

The parties previously were given notice that the "Court may at any time [after expiration of the time for Pugh to file a response] and without further notice to the parties (1) treat the [Special] Report and supplement and any supporting evidentiary materials as a … motion for summary judgment …, and (2) rule on the motion, in accordance with the law, after considering any response filed in compliance with this Order."  (Doc. 28 at pp. 2-3).  Pursuant to that disclosure, the undersigned Magistrate Judge will now treat the defendants' submissions as having presented arguments for summary judgment and will recommend that summary judgment be granted as to the claims asserted against the defendants in their official capacities but denied as to the claims asserted against the defendants in their individual capacities.

## II.    Summary Judgment Standard

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party …. [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citation omitted).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Alternatively, a movant who does not have a trial burden of production can simply assert that the nonmoving party "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point

to specific record materials. … [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  Under either scenario, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists as to each element of the underlying claims. *See Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P. 56(c)(1)(A).

To establish a genuine dispute of material fact, the nonmoving party must produce such evidence as would be sufficient for a reasonable trier of fact to return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  When evaluating whether a genuine dispute of material fact exists, the court must view all of the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor.  *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a).   Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   Facts

The following facts are taken from Pugh's verified Complaint (Doc. 1) and the sworn/ verified evidentiary materials submitted by the defendants (Docs. 21-1 through 21-5; Docs. 27-1 through 27-2; Docs. 42-1 through 42-3).[2]

---

[2]  Where facts are in dispute, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992).  Accordingly, the "facts" as set forth herein are merely for purposes of evaluating summary judgment and may not constitute the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) (explaining that "what we state as 'facts' … for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts") (citation  omitted).  Because Pugh signed the Complaint (Doc. 1) and his affidavit

Pugh was attacked by inmate Marvin Miller, a/k/a "M & M," on November 18, 2020. (Doc. 1 at pp. 3 & 5). Approximately two weeks prior, inmate Miller had begun walking openly around B-Dorm with what was described as a "knife" or an "ice pick" while giving the appearance of being on drugs. (*Id.* at p. 4). On or about November 14, 2020, inmate Miller further began mumbling about how other inmates were out to get him. (*Id.*). At approximately 5:30 p.m. on November 18, 2020, inmate Miller jumped Pugh inside B-Dorm and stabbed him in the face. (*Id.*). Despite having been informed about inmate Miller's concerning conduct, the defendants ignored the information[3] (*id.* at pp. 4-5), and no officers were inside the dorm at the time of the incident (*id.* at p. 5). Inmate Miller subsequently was found guilty of assault with a weapon, transferred to a maximum-security facility, and designated as Pugh's enemy. (*Id.*).

The institutional incident report detailing the assault provided as follows:

> On November 18, 2020 Correctional Lieutenant Tracy Sykes was assigned as the shift commander at Ventress Correctional Facility. At approximately 6:30 p.m., B dormitory was released for chow. Inmate Petro Pugh B/M 192319 (B4-6A, No ISR) was at the microwave when he was approached by Inmate Marvin Miller B/M 316154 (B4-10B, No ISR). Inmate Miller began to strike inmate Pugh with a[n] inmate made knife. Inmate Miller grazed inmate Pugh with the weapon causing a superficial laceration to the nose and head. Inmate Miller ran out the dormitory threw down the weapon and was apprehended on the yard. Correctional Officer Walker retrieved a piece of metal with a black and white string tied to one

---

(Doc. 36-1 at p. 1) under penalty of perjury, the factual contents may be considered for purposes of summary judgment. *See Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019). Pugh also has submitted numerous sworn inmate affidavits (Doc. 36-1 at pp. 2, 3, & 5-12) that the court will consider. Pugh's written responses in opposition (Docs. 36 & 48), however, are unsworn and not made under penalty of perjury. The court thus will not consider any factual averments contained therein. *Sears*, 922 F.3d 1206; *see also Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (holding that "[u]nsworn statements may not be considered by a district court in evaluating a motion for summary judgment") (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003), *as amended*, (Sept. 29, 2003)). Moreover, although inmate Johnny Brown's affidavit (Doc. 36-1 at p. 4) bears the signature of a notary, it does not purport to be sworn and will not be considered. *See* Fed. R. Civ. P. 56(c)(4).

3  Pugh contends that when inmates informed the defendants about inmate Miller's behavior, Officer Thomas responded with "What do you expect me to do? He's high," Lt. Nieves did nothing, and Officer Floyd went outside to smoke a cigarette. (Doc. 1 at pp. 4-5).

end and the other end sharpen [sic] to a point, off the ground near B Dormitory. Correctional Officer Desmond Hicks escorted inmate Pugh to the health care unit. At approximately 6:30 p.m., Wexford Licensed Nurse Varner Perrissa conducted a medical assessment on inmate[] Pugh.  Inmate Pugh was treated and released back to his assigned dormitory.  Correctional Officer Devin Baker escorted inmate Miller to the health care unit.  At approximately 6:50 p.m., Nurse Perrissa conducted a medical assessment on inmate Miller.  Inmate Miller was treated and processed into the Restrictive Housing unit, cell F5-1A.  Inmate Miller was advised that he will receive[] disciplinary action for assault on an inmate with a weapon. At approximately 10:00 p.m., Lieutenant Sykes placed the weapon in the Evidence Box, sealed the evidence box with evidence tape and placed the evidence in the evidence box located in Central Control.  Correctional Captain Jeff Emberton was notified of the incident.  No further action taken at this time.

(Doc. 21-2 at p. 2).

Pugh's body chart (medical examination) prepared at 6:30 p.m. on November 18, 2020 reflects his account to medical staff that "The man was high and stabbed me." (Doc. 21-2 at p. 3; Doc. 21-3 at p. 21).  And upon examination, Pugh was observed to have the following injuries: "5 cm superficial non-penetrating laceration to L side of forehead.  5 cm superficial laceration inner L eye.  3 cm abrasion L back side of head.  2 cm abrasion to R side back of head."  (*Id.*). On a scale of 1-10, Pugh rated his associated pain as a "1."  (Doc. 21-3 at p. 22).  Medical staff treated Pugh with steri-strips, a tetanus shot, and prescription antibiotic and pain medications. (*Id.* at pp. 14, 15, 17, & 22).  At a follow-up appointment on November 20, 2020, medical staff noted that Pugh's steri-strips were intact, observed no bleeding or signs of infection, and released Pugh to return as needed.  (*Id.* at p. 17).

The defendants have testified by affidavit that they had no knowledge of any complaints about inmate Miller.  (Docs. 21-1, 21-4, 21-5, & 42-1).  The defendants further deny that they had any knowledge or information of a potential attack on Pugh or any objective factual basis or awareness that a substantial risk of serious harm existed as to Pugh.  (Doc. 27-1 at p. 2; Doc. 27-2 at p. 1; Doc. 42-1 at p. 1).

**IV.     Discussion**

Pugh claims that the defendants failed to protect him from an inmate attack in violation of his Eighth Amendment rights. (*See* Doc. 1 at pp. 2-5). The defendants contend that Pugh's claims lack merit, that they did not violate Pugh's constitutional rights, and that they are entitled to immunity in their official and individual capacities. (*See* Doc. 21 at pp. 3-4).

**A.     Eleventh Amendment immunity bars Pugh's damages claims against the defendants in their official capacities.**

Official capacity suits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As such, a state employee may not be sued in his or her official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the immunity, *see Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 59 (1996). With specific respect to the types of claims now being asserted by Pugh, it has been recognized that "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (*citing Carr v. City of Florence, Ala*., 916 F.2d 1521, 1525 (11th Cir. 1990)). The defendants therefore are entitled to sovereign immunity as to all claims that seek an award of monetary damages against them in their official capacities. *See, e.g., Selensky v. Alabama*, 619 F. App'x 846, 849 (11th Cir. 2015) ("[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]."); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials in their official capacities are protected under the Eleventh Amendment from suits for damages); *Edwards v. Wallace Cmty. Coll*., 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

**B.      Pugh has presented genuine disputes of material fact on his claims against the defendants in their individual capacities.**

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations omitted); *see also Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has a constitutional right to be protected … from physical assault by other inmates."). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *Farmer*, 511 U.S. at 828.

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," and ordinary lack of care for a prisoner's health or safety will not support an Eighth Amendment claim. *Farmer*, 511 U.S. at 837. "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation [under the Eighth Amendment], there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982). The law is clear that both objective and subjective elements are necessary. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d at 1090, 1099 (11th Cir. 2014).

With respect to the objective element, an inmate must first show "an objectively substantial risk of serious harm … exist[ed]. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028-29 (11th Cir. 2001), *abrogated on other grounds by*

*Twombly*, 550 U.S. 544.  As to the subjective element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference … ."  *Farmer*, 511 U.S. at 837-38 (internal quotation marks omitted). A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident].").

Finally, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks and citations omitted). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*  In sum, a prison official cannot be held liable under the Eighth Amendment unless there is an objectively substantial risk of serious harm to an inmate, the prison official had knowledge of the risk, and despite such knowledge the prison official consciously disregarded the risk.  *See Farmer*, 511 U.S. at 837 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) ("Proof that the defendant should have perceived the risk, but did not, is insufficient.") (citing *Farmer*, 511 U.S. at 838); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).

Here, Pugh has stated under oath that inmate Miller repeatedly had been observed carrying an "ice pick or knife" in the two weeks preceding the attack.  (Doc. 1 at p. 4; Doc. 36-1 at p. 1). Pugh also has submitted sworn affidavits from multiple inmates to the same effect:

- "During the previous 10-14 days Marvin Miller AKA M & M had been walking around B-4 side with an Ice Pick in his hand, staring at various inmates and at various times it seemed like M & M was even stalking different inmates." (Doc. 36-1 at p. 3, Affidavit of Michael Long).

- "For several days Marvin Miller aka M & M … had a knife/Ice pick on him constantly … ." (*Id*.).

- "I was in the front t.v. area, when I saw M & M walked [sic] up with his Ice Pick/Knife in his hand.  M & M had been walking around the dorm all day long almost like he was stalking different inmates." (*Id*. at p. 3, Affidavit of Eddie Stinson).

- "During the previous couple of weeks, Marvin Miller AKA M & M had been walking around B-4 side with an Ice Pick in his hand, staring at various inmates and at various times it seemed like M & M was even stalking different inmates." (*Id*. at p. 6, Affidavit of Brian Lawson).

- "M & M was constantly flexing with his knife/Ice pick all day long, without any intervention from the Officer's [sic]." (*Id*.).

- "On November 18, 2020, … I was in the back t.v. area when M & M walked up with his Ice Pick/knife in his hand … .  [I]t felt to me, like M & M was stalking me … ." (*Id*. at p. 7, Affidavit of Irilmoskomazzeral Washington).

- "During the previous 7 to 10 days Marvin Miller had been walking around B-4 side with either a knife or an Ice Pick in his hand, staring at various inmates and even stalking various inmates." (*Id*. at p. 8, Affidavit of Roy Thomas).

- "During the previous 10 days Marvin Miller had been walking around B-4 side with an Ice Pick in his hand, staring at various inmates and even stalking different inmates." (*Id*. at p. 10, Affidavit of Norman Ernest Widdoson).

- "For [t]wo (2) days Marvin Miller had been up 24 hours and he had a knife/Ice Pick on him constantly mumbling about folks were out to get him … ." (*Id*.).

- "During the previous 10 days Marvin Miller had been walking around B-4 side with an Ice Pick in his hand, staring at various inmates and even stalking different inmates." (*Id*. at p. 11, Affidavit of Jeremy Lee Gardner).

Pugh likewise has submitted sworn evidence that each of the defendants specifically was made aware of the potential danger being posed by inmate Miller:

- "Different prisoners spoke to Officer Paris Thomas who replied 'what do you expect me to do' and she walked away saying 'he's high.'" (Doc. 1 at p. 4).

9

- "On November 18th, 202[0], in B-4 side at Ventress Corr. Fac. Prisoner's [sic] complained to Victor Nieves Lt. about Marvin Miller's actions of carrying an ice pick. Lt. Nieves took no action." (*Id*.).

- "On Nov. 18th, 2020, after 2:00 p.m. shift change … prisoners who lived on B-4 side told officer Brandon Floyd about prisoner Marvin Miller's actions & officer Brandon Floyd's reaction was to go outside on B-Dorm's porch to smoke a cigarette." (*Id*. at p. 5).

- "Several inmates went out and told Brandon Floyd, CO, that Marvin Miller had a knife or ice pick and was walking around with it in his hand and they asked Officer Floyd to have him removed from the dorm.  Officer Floyd did nothing, [but] instead went outside to smoke a cigarette." (Doc. 36-1 at p. 8, Affidavit of Roy Thomas).

- "I was one of the prisoners in B-4 who advised Officer Floyd that Miller had a knife in his hands and that various other prisoners felt really uncomfortable and asked CO Floyd to do something about it, and COI Floyd's response was to go outside and smoke a cigarette, and this was way before this incident occurred." (*Id*. at p. 12, Affidavit of Jeremy Lee Gardner).

Such sworn averments cannot be ignored at the summary judgment stage—and the evidence must be construed in a light most favorable to Pugh as the nonmovant.  *See Sears,* 922 F. 3d at 1206.  Here, that standard compels finding for purposes of summary judgment that inmate Miller was observed carrying a weapon openly and consistently in the days preceding the November 18, 2020 incident, that inmate Miller additionally was observed during that period acting under the influence and in an intimidating manner, that multiple inmates reported inmate Miller's behavior and possession of a weapon to the defendants, and that the defendants took no type of responsive action.  On such a record, material issues of fact exist as to whether inmate Miller objectively posed a substantial risk of serious harm, whether the defendants were subjectively aware of the risk, and/or whether the defendants responded reasonably.  *See Cottone*, 326 F.3d at 1358.  Moreover, because Eighth Amendment jurisprudence is firmly established in this particular arena, qualified immunity would not provide an appropriate basis for entering summary judgment in the defendants' favor when viewing the current record as a whole.

V.     **Conclusion**

For these reasons, the Magistrate Judge hereby **RECOMMENDS** as follows:

1.  that summary judgment be **GRANTED** in favor of the defendants on Pugh's claims
    for monetary damages against them in their official capacities;

2.  that summary judgment be **DENIED** as to the defendants on Pugh's claims against
    them in their individual capacities; and

3.  that this action be set for jury trial on the surviving claims.

It is **ORDERED** that all objections to this Recommendation must be filed no later than

**June 25, 2024**.  An objecting party must identify the specific portion(s) of all factual findings/

legal conclusions to which objection is made and must describe in detail the basis for each

objection.  An objecting party also must identify all claims or defenses that the Recommendation

has not addressed.  Frivolous, conclusive, or general objections will not be considered.

If timely objections are received, the District Judge will conduct a *de novo* review of the

findings or recommendations to which objection has been made.  The District Judge may accept,

reject, or modify the Recommendation or may refer the matter back to the Magistrate Judge with

instructions for further proceedings.  *See* 28 U.S.C. § 636(b)(1)(C).  A party shall be deemed to

have waived the right to challenge on appeal a District Judge's order to the extent it is based upon

unobjected-to findings or recommendations.  The court on appeal may review unobjected-to

factual and legal conclusions only for plain error if necessary in the interests of justice.  *See*

11th Cir. R. 3-1.

No party may appeal this Recommendation directly to the United States Court of Appeals

for the Eleventh Circuit.  A party may appeal only from a final judgment ultimately entered by the

District Judge.

**DONE** this the 11th day of June 2024.

_____

**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**